Filed 7/7/15  In re D.C. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | |
| F.C.,<br><br>        Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF SOLANO COUNTY,<br><br>        Respondent.<br><br>SOLANO COUNTY HEALTH AND SOCIAL SERVICES,<br><br>        Real Party in Interest. | A144734<br><br>(Solano County<br>Super. Ct. No. J42440) |

F.C. (Father) is the presumed father of D.C., who was born in July 2013.  Father filed an extraordinary writ petition (Cal. Rules of Court, rule 8.452) seeking relief from the juvenile court's orders issued at the six-month status review hearing terminating his reunification services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1]  We shall deny the petition.

---

[1] All further statutory references are to the Welfare and Institutions Code.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Father has filed many proceedings with this court, both with respect to D.C. as well as D.C.'s older brother, F.C. We first set forth the facts in relation to him as previously stated in our opinion in *In re F.C. and D.C.* (May 22, 2015, A141496, A141828, A143095, A141925, A142089, A142474 [nonpub. opn.]) (the Consolidated Case), from which we quote pertinent portions:[2]

"On April 18, 2013, the Contra Costa County Children & Family Services Bureau (Bureau) filed a [section 300] petition on behalf of the parents' two-year-old son F.C., alleging that [M.C. (Mother)] had failed to protect the child from exposure to domestic violence, thereby placing the child at risk of harm. The petition alleged that the previous week Father had kicked Mother, who was then 26 weeks pregnant, in the stomach, resulting in stomach pain and vaginal bleeding. He had also punched her in the chest and back, held her against the wall by her neck, forced her to drink his urine, and had hit, pushed, and struck her approximately once a week for the past two years. The petition also alleged Mother had mental health issues that put the child at risk, in that 'she hears voices and sees things that are not there.'

"On April 19, 2013, F.C. was ordered detained.

"On September 11, 2013, Father filed a motion to dismiss the petition. He denied engaging in domestic violence and asserted neither he nor Mother suffered from mental illness such that would cause F.C. to suffer harm.

"After several delays and continuances, the jurisdictional hearing was held on October 7, 2013. Police officer Daniel Dansie testified that he had contact with Mother for several days during the week of April 15, 2013, after an initial contact on a report of domestic violence. Mother told him Father frequently engaged in acts of violence

---

[2] On our own motion, we take judicial notice of our opinion in the Consolidated Case. (See Evid. Code, § 451, subd. (a).) Real Party in Interest's request for judicial notice filed June 9, 2015, is granted. Modifications to the text are indicated by brackets, and deletions are indicated by ellipses.

towards her, including hitting, pushing, and shoving. F.C. was present in the home when these acts occurred, though he did not personally witness them.

"On one occasion, Father reportedly kicked Mother in the stomach when she was noticeably pregnant. Mother divulged this information when she was away from home, during an appointment for F.C. at a health clinic. Because Father was very controlling, she did not feel she could have reported the incident earlier. At that time, she stated she had been experiencing contractions, pain, and vaginal bleeding every day since the incident. Later, she discharged herself from the hospital and told Dansie that she was fine; however, he received information to the contrary from Father's brother and from hospital staff. He was told by family members that F.C. had been born prematurely with a heart defect, which required ongoing medical attention. Dansie believed Mother was unable to provide for F.C. due to her inability to make coherent, sound decisions and because of her statements regarding domestic violence. . . .

[¶] . . . [¶]

"Lindsay Kennedy, a social worker supervisor, testified Mother had reported domestic violence occurred at least weekly for the past two years. Family members reported Mother had mental health issues. The paternal grandmother reported that both parents had severe mental disabilities. The Bureau also substantiated an earlier allegation that Mother had neglected F.C.'s medical needs.

[¶]

"The juvenile court denied Father's motion to dismiss the petition. The court found Father and Mother lacked credibility, in part because they had not allowed social workers into their home and because Mother did not cooperate in meeting with the social workers. The court concluded F.C. was described by section 300, subdivision (b), finding the allegations concerning domestic violence to be true, including the allegation that Father kicked Mother in the stomach. The court also found true an allegation that Mother's mental health issues placed the child at risk, in part because her behavior in court, while respectful, was 'bizarre.' [Fn. omitted.]

[¶]

3

"On December 26, 2013, the matter was ordered transferred to Solano County.

[¶] . . . [¶]

"At the disposition hearing, social worker Eleanor Walker was received as an expert in the areas of child welfare, social work, and domestic violence. She testified that she was assigned as the social worker to this case in April 2013. She did not meet the parents in person until August 2013. She told them they would need to have a mental health assessment completed prior to consideration of their child being returned to them. Mother indicated that she did not believe she needed services. Walker made another attempt to offer services to them in October 2013, and explained to Mother that she would need to meet with a domestic violence liaison by herself. Mother again stated that she did not feel she needed those services. Walker also referred both parents to mental health services in December 2013 and scheduled an appointment for Mother to meet with the domestic violence liaison. Mother did not attend the appointment and the parents did not participate in any mental health assessments.

[¶]

"Mother made at least three or four attempts to communicate that she was being physically harmed by Father. In Walker's opinion, these statements were later recanted because Mother feared for her safety. Mother had likely developed 'learned helplessness' just to remain in the relationship. Walker would expect the domestic violence in this case to increase in severity over time without treatment or intervention. F.C. had reportedly been very aggressive towards other children while in foster care, which was of concern because it suggested he has been adversely affected by domestic violence in the home. Given that there had been no treatment or intervention to address the problem, she rated the adverse risk of returning F.C. to the home to be 'extremely high.' She explained to the parents that services were being offered with the goal of returning the child to them, but they did not appear to understand her.

[¶] . . . [¶]

"As to disposition, the juvenile court noted that the Contra Costa court had already found that domestic violence had occurred and that Mother had mental health issues.

4

Since the time of that hearing, parents had refused to accept services offered to mitigate the effects of those findings. The court continued F.C. as a dependent, finding clear and convincing evidence that there was a substantial danger to the child if he were returned home, and that removal from the parents' custody was necessary. The court ordered the [Solano County Department of Health & Social Services (Department)] to provide reunification services, and ordered the parents to participate in those services. The matter was set for a September 9, 2014 pre-permanency hearing in order to allow parents six months of reunification services.

[¶] . . . [¶]

"On April 1, 2014, the Department filed a section 300 petition as to D.C., who was then eight months old. The petition alleged D.C. was at risk of harm based on the allegations sustained in the matter of his older brother F.C., as well as on the parents' failure to participate in any services to mitigate the risk to his sibling. (§ 300, subds. (b), (j).) The accompanying detention report noted the parents had attempted to obtain a restraining order against the assigned social worker in response to her efforts to interview the family.

"On April 2, 2014, the parents did not appear at the detention hearing, although they had received notice. The juvenile court ordered D.C.'s detention and issued a protective custody warrant for the child, who had not yet been located. Services were ordered for both parents. The child was detained the following day.

[¶] . . . [¶]

"On April 25, 2014, the juvenile court ordered continued detention of D.C., finding it would be detrimental to his physical and emotional health to be returned. The Department's dependency petition was sustained.

[¶]

"At a contested disposition hearing held on May 9, 2014, the social worker testified that the parents had not attended any visits since D.C.'s detention. She recommended family reunification services rather than family maintenance services because of concerns that domestic violence could be continuing and because the parents

5

had not yet chosen to participate in any services.  The court adopted the Department's recommendations . . . ."

## II.    *The Consolidated Appeals and Our Opinion*

In dismissing the Consolidated Case for Father's failure to raise any arguable issues, we found substantial evidence in the form of testimony from the social workers supported all of the juvenile court's jurisdictional and dispositional findings.  We noted the record showed "both parents had a documented history of domestic violence and mental health concerns."  Further, while both of the social service agencies involved here had offered to provide reunification services to help ameliorate these serious issues and concerns and reunify the family, the parents had deliberately refused to participate in any of these services.

## III.   *Six-Month Status Review Hearing*

### A.  *The Department's Status Report*

On October 31, 2014, the Department filed a six-month status review report for D.C., recommending that the juvenile court terminate reunification services for both parents and set a hearing pursuant to section 366.26.  According to the report, between April 9, 2014 and October 14, 2014, the parents had only twice visited with D.C., on one occassion appearing during another relative's visitation slot without having obtained prior approval from the Department.[3]  Since October, Father had been attending visitation with D.C. once a week.

Overall, it had been very difficult to engage either parent in their case plan services because they were generally unwilling to even meet with the assigned social worker.  In spite of having been given five referrals for a psychological evaluation and six referrals for mental health services, Father had refused take part in any of the offered assessments or treatment.  Instead, he self-reported having obtained his own treatment, which was unverifiable as he failed to provide adequate documentation and refused to

---

[3] The parents had been taken off of the visitation calendar for excessive failures to visit and had been informed that they needed to place themselves back on the visitation calendar by contacting the social worker prior to a scheduled visit.

sign a release of information. The Department continued to have "serious concerns" regarding the prior incidents of domestic violence and the parents' apparent inability to obtain appropriate treatment. While Father had recently made efforts to comply with his case plan, "crucial time ha[d] been lost."

D.C.'s six-month status review hearing took place over six separate court dates from November 6, 2014 to March 20, 2015.[4]

### B. Father's Testimony

Father acknowledged he failed to visit his children for several months, blaming car problems. However, he admitted he could drive, had access to a car, and knew how to use public transportation. He was working at a Firestone automobile shop "somewhere around" the Oakland area, and previously worked for Jiffy Lube. His jobs had included working on cars, including performing oil changes and tune-ups, working with brakes and spark plugs, and performing other repairs. He admitted that even though the Department offered him bus passes and gas cards for his transportation, he had refused to sign the necessary release documents. He also confirmed that after this dependency proceeding was initiated he did not visit D.C. until July 2014, and did not resume regular visitation until October 2014. During a recent visit, he let F.C. eat five or six yogurts because he thought F.C. was "pretty hungry" and he had been advised, "Don't try to take his [F.C.'s] food away from him."

Father claimed he waited until October 2014 to meet with his assigned social worker, Jesus Naranjo, because he did not know who Naranjo was. However, he acknowledged having received service referrals from Naranjo throughout this dependency proceeding.

Father testified that he had a learning disability and problems with memory. He said he had been diagnosed with Pervasive Developmental Disorder (PDD)[5] as a child. He did not recall ever telling the Department that he had outgrown his learning disability.

---

[4] The case was continued from time to time, due in part to two Marsden hearings (*People v. Marsden* (1970) 2 Cal.3d 118) requested by Father and denied by the juvenile court.

[5] PDD is a disorder on the autism spectrum.

7

Instead, he claimed he told his social worker about his disability "all the time." He later testified he told the social worker he had PDD "maybe almost a month or something" ago. He denied having any intellectual disability.

With regard to his case plan, Father said he gave his social worker a report from his psychiatrist. He also claimed to be participating in individual therapy, parenting classes, and domestic violence classes. He acknowledged some of these classes were online classes that the Department would not accept. He was also unable to answer questions about the logistics of his participation in these online classes. He denied enrolling in an online anger management class on the same day that he obtained his certificate of completion.

Father went to a domestic violence class intake appointment at an agency called STAND! in December 2014, during which the agency told him he did not need to participate in domestic violence classes.[6] He conceded the juvenile court had found he had a history and pattern of engaging in domestic violence, but he refused to admit any domestic violence actually occurred. Father enrolled in parenting classes with Parent Stress Educational Services in December 2014, and was scheduled to start classes on January 6, 2015. He was prepared to obtain verification of his participation in the course and permit the Department to contact this service provider. With regard to mental health services, Father indicated that he was meeting with therapist Joyce Caldera. He later testified that he stopped meeting with Caldera and was now meeting with a woman named Stephanie.[7]

### C. Testimony of Audrey Reyes

Social worker supervisor Audrey Reyes was Naranjo's supervisor. She had also personally supervised two visits between Father and his children. During the visits, Father would sit in a chair the majority of the time and he rarely interacted or communicated with D.C. D.C. did not respond to Father during visits. Reyes would

---

[6] Father claimed he had found STAND! on his own, but later admitted Naranjo gave him the agency's phone number.

[7] Stephanie Woolford is reportedly a licensed clinical social worker.

have expected Father to "get[] down on the floor and play[] with the child[ren] at their level, and interact[] with them, and play[] games or ensur[e] that the children don't put small things in their mouth, as a choking hazard, that he would be able to respond to that. I would expect him to be able to understand how to change a child's diaper without fidgeting, and being comfortable with changing a diaper," but Father did not demonstrate any of these behaviors.

It was not until Fall 2014 that Father began expressing a willingness to participate in services. Father reported he had a disability, but Reyes did not personally observe any difficulty in his functioning except "he just needed a little bit of extra time." In January 2015, Father met with Reyes and Naranjo, and they discussed whether he needed assistance or modifications to address his learning disability. Father denied needing any such help. After he sent an e-mail stating that he had PDD, she sought to insure he received services from a local regional center. Regional centers provide services for individuals who have developmental delays. Reyes was not aware of any recent documentation of Father's alleged disability.

The Department referred Father for a mental health assessment. He was also referred to North Bay Regional Center to determine whether he needed therapy services or any additional support. Naranjo prepared a letter for Father, directing him to get an evaluation at the regional center. Father had demonstrated on more than one occasion that he was able use a referral to make phone calls and set up appointments.

### D. Testimony of Jesus Naranjo

Naranjo testified that Father's case plan included obtaining mental health services, participation in parenting classes and a domestic violence treatment program, and visitation with his children. Between April 2014 and October 2014, Father was evasive about participating in reunification services. During that time, despite sending a "plethora of letters to [the parents'] addresses" and conducting unannounced visits, Naranjo was never able to locate them. He did not meet Father in person until October 2014, which was his first opportunity to assess Father's mental health. Father admitted

9

he had intentionally avoided participating in services. After their meeting, Naranjo made a referral for Father to get a mental health assessment.

The Department offered to provide bus passes and gas cards so both parents could get to services and visits, but they consistently refused to sign a required receipt. Instead, they asked the Department to pay for repairs to their car.[8] Father claimed his work schedule prevented him from participating in certain classes; however, he never provided Naranjo with a work address or his work schedule. Nevertheless, the Department tried to locate services near where he reported he was working. Father had wanted to participate in Parent Café, a peer-run program, which was not approved by the Department. Naranjo also instructed Father that online courses were not acceptable. Father enrolled in a 12-week approved parenting class called Family Paths on January 12, 2015. Based on the interactions with his children during visitation, Naranjo's impression was that Father appeared to be "going through the motions" and was not internalizing the class material.[9]

Naranjo provided Father with referrals for free or low-cost mental health services. He also attempted to help Father transfer his Medi-Cal benefits to his county of residence. Father would say he was having difficulty reaching the service providers, but Naranjo never had any trouble getting in contact with them over the phone. Naranjo later learned that one agency denied Father services because "he was evasive and he didn't follow the protocol." Reportedly, Father had said he could not think of anything helpful that the agency could provide to him. STAND! also initially declined to offer him services when he denied having committed any domestic violence. After Naranjo sent STAND! the dependency petition, disposition report, and case plan, the agency provisionally accepted him. However, the agency reported Father struggled to take

---

[8] On May 7, 2014, the parents sent an e-mail message to social workers Walsh and Naranjo asking for $1,200 to pay for repairs to their car.

[9] Father's conduct around D.C. was erratic. At one point, Father reported D.C. was on life support and he was being denied access to his son, when D.C. was only in the emergency room to obtain medication. Naranjo also had concerns because D.C. appeared traumatized after one of Father's visits.

10

accountability during group meetings and would need to be continually monitored for appropriateness.

Since December 2014, Father has resumed refusing to meet with Naranjo in person. Instead, "the volume of e-mails has been very large between [Father] and myself [and] the majority of the e-mails on a given day were similar in nature." At first, the e-mails were respectful. Around the first week in January 2015, the tenor of his e-mail communications changed, with Father reporting difficulty breathing and claiming to be under a lot of stress. On one weekend, Father sent Reyes 22 e-mails, which were virtually all the same. (RT 364) Several e-mails have threatened lawsuits for failure to accommodate his disability. It was Naranjo's opinion that the paternal grandmother was sending many of these e-mails from Father's account.

Naranjo referred Father to a psychologist named Christian Speed. Father told Naranjo that Speed told him there was nothing wrong with him and that he did not qualify for services. But when Naranjo called her, she said Father had been evasive and reported no domestic violence history. She offered him individual therapy, but he refused. Father located mental health services on his own and asked the Department to pay for them. Naranjo told him that he needed to try to go through Medi-Cal first. Naranjo arranged for a psychological evaluation but Father refused to see the designated provider and said he would get a psychological evaluation on his own. He refused to give Naranjo that provider's name and location.[10]

Between April and the end of September 2014, Father did not mention having any type of disability that needed accommodation. When Naranjo and Reyes met him, he said he needed things to be explained to him a little slower and asked for information to be in writing. Reyes asked if he understood a Department letter listing his referrals, and

---

[10] Father submitted documents purporting to be a psychological evaluation. Upon review, Naranjo found they were in fact a series of letters indicating additional time was needed to process Father's condition. Father also provided further documents to purporting to show a diagnosis from a Dr. Nelson. However, the documents were not signed by Dr. Nelson and only stated a conclusion as to Father's condition without any indication that any analysis was done.

11

he said he did. Previous court reports stated that Father asserted he outgrew the special education needs that he had when he was in school. Additionally, while he has claimed to be autistic, Father has never produced any assessment indicating that he has autism.

Naranjo was present during the hearing to terminate reunification services as to F.C., which concluded in December 2014. The juvenile court judge in that case found the Department had provided reasonable services to Father as to F.C. During Father's testimony in that case, he did not indicate that he had a developmental disability that precluded him from certain services. At that time, the judge questioned the validity of online classes that Father claimed to have taken. Following the hearing, Father has become engaged in Department services, including attending the STAND! program, individual therapy, and parenting instruction. Once he decided to enroll, he has been attending and participating. In Naranjo's opinion, Father would have been capable of engaging in services a year and a half ago.

Father disclosed on January 25, 2015, that he had been diagnosed with PDD. Naranjo attempted to assess his claim; however, father never provided any documentation. Medical records were subpoenaed showing he had not been tested for any disability since he was in second grade. Naranjo referred Father for a mental health assessment and also gave him a referral to the East Bay Regional Center. When he later checked with this agency, he was informed Father never contacted them.[11]

Father began requesting a variety of "accommodations" for his claimed disability. He requested a device to record speech, a typewriter, a tablet, a note taker, a companion dog, and furniture. On one occasion, Father asked Naranjo drive him to parenting class, wait for him, and bring him back home because he broke the key off in his car's ignition. On another occasion, Father asked Naranjo call him 10 times a day. Naranjo was unable to ascertain any relationship between Father's requested accommodations and a

---

[11] Father has never submitted any medial documentation that he has a disability requiring accommodation.

12

disability.  When Naranjo contacted Father's service providers, they reported Father had not requested any accommodations.

In Naranjo's opinion, providing services for another six to eight weeks would not make a substantial difference in allowing the Department to determine whether to return D.C. to Father's care.  Father's behavior has not reflected that he is actually benefitting from the services.  This assessment included consideration of the involvement that occurred with respect to the reunification services that were provided concerning F.C.  Naranjo did not believe there was a substantial probability the child would be returned to Father if the services were extended to the 12-month date.

### E.  The Juvenile Court's Rulings

The juvenile court noted they were only a month away from the 12-month deadline and that Father had demonstrated a history of making excuses and not cooperating with the Department.  The court found reasonable services had been offered, and that Father's arguments to the contrary were invalid because he refused to cooperate with the Department's efforts to determine what his actual needs were.  The court had observed Father in court, and believed he could have cooperated with his case plan, but simply chose not to.  The court found there was no substantial probability the child would be returned within the six-month legal period.  It terminated reunification services and set a section 366.26 hearing.  Father filed an extraordinary writ petition seeking relief from the court's orders.

## DISCUSSION

### I.    Adequacy of Reunification Services

Whenever a child is removed from a parent's custody, the juvenile court must order the social worker to provide reunification services to the child's parents, unless the court finds by clear and convincing evidence that specified circumstances justify denial of services.  (§ 361.5, subds. (a)(1) & (b).)  Where, as here, the child was under three years of age on the date of initial removal, court-ordered services shall be provided for a period of six months from the dispositional hearing but no longer than 12 months from the date the child entered foster care.  (§ 361.5, subd. (a)(1)(B).)  In such a case, the court

13

may terminate reunification services at the six-month review hearing and schedule a section 366.26 hearing if the court finds by clear and convincing evidence the parent failed to participate regularly and make substantive progress in the court-ordered plan. (§ 366.21, subd. (e).) Regardless of the parent's compliance with the case plan, however, if the court finds it is substantially probable the child will be returned home within six months or that the services offered to the parent were unreasonable, the court must schedule a 12-month review hearing and extend services for another six months. (*Ibid.*)

Reunification services are among the "[s]ignificant safeguards" that have been built into the current dependency scheme in California to provide the parent due process and fundamental fairness while also accommodating the child's right to stability and permanency. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308.) The Department is required to " 'make a good faith effort to develop and implement a family reunification plan . . . [with] the objective of providing such services or counseling "as will lead to the resumption of a normal family relationship." ' " (*In re Jasmon O.* (1994) 8 Cal.4th 398, 424.)

" 'Reasonable efforts' or 'reasonable services' means those efforts made or services offered or provided by the county welfare agency . . . to prevent or eliminate the need for removing the child, or to resolve the issues that led to the child's removal in order for the child to be returned home, or to finalize the permanent placement of the child." (Cal. Rules of Court, rule 5.502(33).) Services will be found reasonable if the Department has "identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult (such as . . . offering more intensive rehabilitation services where others have failed)." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The effort must be made, in spite of difficulties in doing so or the prospects of success." (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69.) "The standard is not whether the services provided were the best that might be provided in an

ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

The adequacy of reunification plans and the reasonableness of the Department's efforts are judged according to the circumstances of each case. (*Christopher D. v. Superior Court, supra,* 210 Cal.App.4th at p. 69.) The juvenile dependency law requires the courts and social services agencies to consider a parent's limitations and disabilities in providing reasonable services. (See *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1790; *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320.)

On appeal, a juvenile court's finding that reasonable reunification services have been offered or provided is reviewed for substantial evidence. (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010.) "We review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] ' "Substantial" evidence is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424.)

Father contends the Department failed to provide him with appropriate reunification services consistent with his purported disability. We are not persuaded. Contrary to Father's suggestion, his inability to make progress in his case plan was caused almost entirely by his own behavior. Even before D.C.'s detention, Father was offered an exhaustive set of services as part of his reunification plan. Yet he chose not to avail himself of those services until after the court terminated services as to the older child, F.C. It is undisputed that Father has participated in services since agreeing to become involved in his reunification plan. His most recent efforts at compliance support the inference that, in spite of whatever condition he may have, he has at all times been able to participate much more fully in his program. Having deliberately chosen not to take advantage of reunification services from April 2014 to October 2014, he cannot persuasively argue that the services offered by the Department were inadequate.

We observe that we are quite familiar with this case as a result of the opinion we recently issued in the Consolidated Cases. Our summary of the record above amply

15

supports the juvenile court's findings. Based on the extraordinary amount of litigation Father has commenced in this court, we also concur with Naranjo's assessment that appears in a September 2014 status review report as to the older child F.C.: "It is bewildering to the undersigned why the parents have been able to travel and file Court documents in Sacramento, CA, Oakland, CA, and spent much time in the Solano County Court House filing motions, but would not make themselves available to meet with the Department, let alone, attend visitation with their children."

## II.     *Risk of Detriment*

To the extent Father argues there is no risk of detriment in returning D.C. to his custody, we are also not persuaded.

In determining that there is a risk of detriment of returning a minor to a parent, the juvenile court must find by a preponderance of the evidence that it would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the minor. (§ 366.22, subd. (a); *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139 (*Dustin R.*); see *In re Heather B.* (1992) 9 Cal.App.4th 535, 560–561.) The juvenile court must consider the efforts, progress, or both, the parent has made in availing himself or herself to services. (*Dustin R., supra,* at p. 1139.)

Completion of the reunification plan is not the sole concern of the juvenile court. There must be an indicium of progress toward family preservation. (*Dustin R., supra,* 54 Cal.App.4th at pp. 1139–1140.) Mere completion of the technical requirements of the reunification plan is one consideration under section 366.22, subdivision (a), but the juvenile court must consider the parent's progress toward eliminating the conditions leading to the children's placement out of the home. (*Dustin R., supra,* at pp. 1141–1142.)

One striking aspect of this case is that throughout the proceedings, Father's visits with his young son have been sporadic at best. Instead of focusing on the well-being of the child, Father has used visitation to try and obtain payments from the Department towards his own automobile repairs. Even during his recent visits he had been unable to interact appropriately with D.C., including becoming uncomfortable during diaper

changing. That Father has completed aspects of his service plan does not mean that he is capable of implementing those services. There was substantial evidence before the juvenile court to show he had not acquired the necessary skills to adequately care for and protect his child. The failure of the parent to make substantive progress in court-ordered treatment is prima facie evidence that return of a minor to the parent would be detrimental. (§§ 366.21, subd. (e) & 366.22, subd. (a).)

Because D.C. is a child under the age of three, his parents are limited to six months of reunification services unless there is probability of return. Father has already failed to reunify with F.C. Section 361.5, subdivision (a)(1)(B) provides services will not exceed six months if the child is under the age of three, unless the court finds a substantial probability of return with an extended 12-month period. During the six months between April and October, D.C. had only one supervised visit with his Father. Father refused to participate in services until October 2014, reverting to his pattern of evasiveness in January 2015. As the Department's November 2014 status report states, as a result of Father's actions, "crucial time has been lost."

## DISPOSITION

Father's petition for an extraordinary writ is denied on the merits.[12] The decision is final in this court immediately. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).) Father's request for a stay of the section 366.26 hearing, currently scheduled for July 22, 2015, is denied as moot.

---

[12] Father's additional arguments regarding preemptory challenges, his demurrer to the petition, and his challenges to the jurisdictional and dispositional findings have already been decided against him in the Consolidated Case.

17

_____
DONDERO, J.

We concur:

_____
HUMES, P.J.

_____
BANKE, J.